**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| ERIC SMITH, and ) | |
| ALLAEDHIN QANDAH, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 4:18-cv-171 |
| ) | |
| ST. CHARLES COUNTY, ) | **JURY TRIAL DEMANDED** |
| DIRECTOR LARRY CRAWFORD, ) | |
|     in his official capacity, ) | |
| OFFICER MICHAEL MCKEE, ) | |
| OFFICER JEFFERY CAST, ) | |
| OFFICER ZACHARY RIDGEWAY, ) | |
| OFFICER CLINTON GRAEBNER, ) | |
| OFFICER "JOHN DOE I," and ) | |
| OFFICER "JOHN DOE II," ) | |
|     in their individual capacities, ) | |
| ) | |
|     Defendants ) | |

## COMPLAINT

### PRELIMINARY STATEMENT

1.    In January 2017, a St. Charles County Jail officer violently grabbed Plaintiff Eric Smith from behind and slammed Mr. Smith's head against a metal stool, nearly costing Mr. Smith his life during his twelve-day incarceration for being too poor to pay municipal fines to St. Charles County. Mr. Smith's injury, combined with improper medical care in the jail, required Mr. Smith to undergo a high-risk brain surgery to reduce a fatal blood accumulation in his skull.

2.    On December 15, 2014, another St. Charles County Jail officer electronically unlocked Plaintiff Alleadhin Qandah's cell to allow another inmate to attack Mr. Qandah. During his eleven months of pretrial detention by St. Charles County, Mr. Qandah was also subjected to severely restrictive solitary confinement and harassed based on his religion. This solitary

confinement punishment was dispensed without justification or even a hearing.

3.    These instances of abuse put both incarcerated Plaintiffs' lives at risk and demonstrate that Defendant St. Charles County (hereinafter, "Defendant SCC" or "SCC") systematically and pervasively fails to train, monitor, supervise, or hold its officers accountable. The result of these systemic institutional failures is that human beings incarcerated in St. Charles County Jail (hereinafter, "SCCJ") risk great physical and psychological harm while confined within the jail's walls.

4.    Plaintiffs Mr. Smith and Mr. Qandah bring this civil rights lawsuit against Defendant St. Charles County and individual officers alleging that SCCJ unconstitutionally detains human beings without regard to their basic physical and psychological safety. The stories of abuse presented by Plaintiffs—one who was awaiting trial and the other an individual convicted of a municipal violation—exemplify the unconstitutional policies and practices of St. Charles County.

5.    Plaintiffs request money damages against St. Charles County and the Defendant officers in their individual capacities for injuries caused by Defendants' unconstitutional actions and customs.

## JURISDICTION AND VENUE

6.    This is a civil rights action arising under 42 U.S.C. § 1983 and the First, Eighth and Fourteenth Amendments to the United States Constitution. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

7.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b), since the Defendants are located in this District and the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

8.      Plaintiff Eric Smith is a 36-year-old Black man, father, and resident of North County, St. Louis. In 2017, Mr. Smith turned himself in to the police on an outstanding municipal violation. At sentencing, the County Judge found that Mr. Smith was unable to pay his fines and sentenced him to twelve days of jail time in SCCJ and a $75 fine. During this period, Mr. Smith was subjected to various constitutional violations, including excessive force by a corrections officer and deprivation of proper medical care that resulted in a near-fatal head injury.

9.      Plaintiff Alleadhin Qandah is a 29-year-old Arab-American and Muslim man and a resident of St. Louis County. Mr. Qandah was held as a pretrial detainee in SCCJ from March 2014 to February 2015. During this period, Mr. Qandah was subjected to various constitutional violations. Such violations include an attack by a fellow inmate facilitated by a corrections officer who intentionally opened Mr. Qandah's cell to allow the attack. After this assault, Mr. Qandah spent at least eight months in solitary confinement, without hearings or any other form of process. Throughout his entire stay, Mr. Qandah was subjected to continued harassment by guards based on his religious identity.

10.     Defendant St. Charles County, Missouri, is a political and geographic subdivision of the State of Missouri existing pursuant to Missouri law and responsible for the operations at SCCJ through the St. Charles County Department of Corrections.

11.     Defendant Larry Crawford is the Director of St. Charles County Department of Corrections ("SCCDOC"). The St. Charles County Jail is a facility directed by the SCCDOC. Defendant Crawford is the highest-ranking official at the jail and the person ultimately responsible for setting and overseeing jail policies, procedures, and daily operations. *See* RSMo.

Section 217.025(3). Defendant Crawford is being sued in his official capacity.

12.     Defendant Michael McKee was a Lieutenant employed by St. Charles County while Plaintiffs Mr. Qandah and Mr. Smith were incarcerated in the SCCJ. Lieutenant McKee caused Mr. Qandah's injury by detaining him in solitary confinement for nearly all of his eleven-month pretrial detention without justification, and also caused Mr. Smith's injuries by failing to order proper medical treatment. Mr. McKee is being sued in his individual capacity.

13.     Defendant Clinton Graebner was a corrections officer employed by St. Charles County while Plaintiff Mr. Smith was incarcerated in SCCJ. Officer Graebner caused Mr. Smith's injuries when he lifted and slammed Mr. Smith into a metal stool causing near-fatal skull injury. Defendant Graebner is being sued in his individual capacity.

14.     Defendant "John Doe I" was a corrections officer employed by St. Charles County while Plaintiff Mr. Smith was incarcerated in SCCJ. On January 18th, 2017, John Doe I accompanied Mr. Smith to the emergency room at St. Joseph's Hospital in St. Charles and interfered with the medical examination so that Mr. Smith did not receive proper medical treatment, causing him long term life-threatening injuries. Defendant John Doe I is being sued in their individual capacity.

15.     Defendant Jeffrey Cast was a corrections officer employed by St. Charles County while Plaintiff Mr. Qandah was incarcerated in SCCJ. Defendant Cast caused Mr. Qandah's attack by unlocking a cell door so that another inmate could enter and attack him, causing him physical and psychological injuries. Defendant Cast also verbally abused and discriminated against Mr. Qandah based on his religious beliefs. Defendant Cast is being sued in his individual capacity.

16.     Defendant Zachary Ridgeway was a corrections officer employed by St. Charles

County while Plaintiff Mr. Qandah was incarcerated at SCCJ. Defendant Ridgeway, by spreading rumors that Mr. Qandah was a "snitch", caused or alternatively was deliberately indifferent to Mr. Qandah's injuries. Defendant Ridgeway is being sued in his individual capacity.

17.     Defendant "John Doe II" was a corrections officer employed by St. Charles County while Plaintiff Mr. Qandah was incarcerated at SCCJ. Defendant Doe II, by harassing and discriminating against Mr. Qandah based on his religion, violated Mr. Qandah's First Amendment rights and put his physical safety at risk. Defendant Doe II is being sued in their individual capacity.

## FACTS

### Eric Smith's Violent Assault by a St. Charles County Officer, Deprivation of Medical Care at SCCJ, and Continuing Harm

18.     Plaintiff Eric Smith is a 36-year-old Black man and resident of North County, St. Louis. In 2017, Mr. Smith turned himself in to the police on an outstanding traffic violation charge from St. Charles in 2014. Mr. Smith was sentenced to twelve days of jail time in SCCJ and a $75 fine. During this short incarceration period, Mr. Smith suffered a near-fatal injury by St. Charles corrections officers. Mr. Smith was incarcerated due to the fact that he was unable to afford a municipal violation fine.

19.     Mr. Smith is a father to an eighteen-year-old daughter who is preparing to start college. Mr. Smith struggles with mental health issues. As a Black man growing up in St. Louis County, Mr. Smith has faced harassment and violence at the hands of law enforcement. For example, in 2000 he was falsely arrested and violently assaulted by a law enforcement canine unit in Ferguson, Missouri. Despite this, his period of incarceration in SCCJ stands out as particularly dehumanizing and violent.

20.     Mr. Smith was incarcerated at SCCJ for twelve days, from January 12, 2017 to January 24, 2017.

21.     On January 18, 2017 around 10:00 a.m., Mr. Smith was playing cards around a table with two other men in one of the "pods" in the SCCJ. One or two corrections officers were in the pod, around ten feet away from the table where approximately six inmates were playing cards. There were approximately 30 total inmates in the pod.

22.     During the card game, one prisoner started harassing Mr. Smith and calling him into the shower area, presumably to attack him away from security cameras. Corrections officers, less than ten feet away, would have heard these threats. Mr. Smith continued to play cards and avoid confrontation, but the inmate still approached and confronted Mr. Smith. Four guards eventually intervened, spraying mace at the two men and separating them five-feet apart.

23.     Mr. Smith and the other inmate did not resist the guards. Once separated, a guard maced Mr. Smith directly in the head. The other uninvolved inmates and officers stood around the room away from the officers and the two men, trying to escape the amount of mace that lingered in the air.

24.     After at least 15 seconds of being separated and compliant, an officer suddenly grabbed Mr. Smith from behind, lifted him, and slammed him to the ground. Mr. Smith's head forcefully struck a metal stool as he was thrown down. As his head struck the metal stool, there was a loud sound, like a metal bat hitting a baseball. Mr. Smith thought he was going to die. Mr. Smith would later discover that the corrections officer who grabbed and slammed him was Defendant Clinton Graebner.

25.     Everyone in the room–and the jail's security cameras–witnessed this act of violence by the corrections officer. No guard intervened to prevent the violence. A security

camera was pointed directly at the area of the pod where Defendant Graebner assaulted Mr. Smith.

26.     Blood started to pour from Mr. Smith's head. Defendant Graebner brought Mr. Smith to the nurse. Records from Mr. Smith's jail medical file state that he suffered deep lacerations above his left eyebrow. The nurse said that he would have to go to the emergency room. She gave him temporary sutures to stop the bleeding and ordered him transferred to the emergency room. His head was throbbing and he felt a burning sensation at the location where his head slammed the stool.

27.     Defendant Graebner was in the medical room as the nurse sutured Mr. Smith's wounds. Mr. Smith heard the nurse asked Officer Graebner, "Why did you do it?" causing Mr. Smith to realize that Mr. Graebner was the one who had injured him. Disgusted with Defendant Graebner, the nurse angrily told him to leave the medical examination room.

28.     A supervising officer also came in to see whether Mr. Smith needed to be sent to the hospital. Mr. Smith explained that the confrontation had already concluded when the corrections officer attacked him, and the supervising officer responded, "Yeah, I've seen the video five times."

29.     Mr. Smith was sent to the emergency room at St. Joseph's Hospital and given six stitches. Officer "John Doe I" accompanied Mr. Smith into the emergency room. Mr. Smith tried to explain the pain he was in, but the guard accompanying him kept interfering and minimizing the situation, saying the assault had just been a "little knock." The doctor asked the jail's medical file describing Mr. Smith's injury.

30.     Mr. Smith believes that the officer's interference caused the doctor not to order imaging or tests.

31.     The doctor prescribed pain medication for Mr. Smith, but SCCJ failed to administer his medication or even an ice pack for the continued extreme pain.

32.     Mr. Smith was transferred back to SCCJ. He continued to experience extreme amounts of pain. He repeatedly requested his prescribed pain medication, but the requests were refused. Thirty-six hours after his assault, he was given only a watery ice pack.

33.     Upon return to SCCJ, Mr. Smith was ordered to solitary confinement. At SCCJ, solitary confinement consists of 23 hours alone per day in a cell the size of a parking spot, in complete darkness and with many restrictions on access to external communication and the law library. For one hour per day, Mr. Smith was allowed out of the solitary cell in shackles without interaction with others. Mr. Smith remained in solitary until he was released at the end of his sentence. His injuries were not properly cared for while in solitary.

34.     Mr. Smith asked to fill out an incident report as soon as he came back from the hospital. At first the jail guard refused to give him the necessary paperwork. He was eventually given a form and filled one out that same day of his assault, but received no response.

35.     For the remainder of his time incarcerated at SCCJ, Mr. Smith was in incredible pain. Mr. Smith describes this pain as the worst head pain he had ever experienced. Mr. Smith repeatedly told the SCCJ guards he was in extreme pain, but the SCCJ guards refused to offer him additional medical attention.

36.     On January 20, 2017, Mr. Smith became dizzy and light-headed in his solitary cell. Mr. Smith told the SCCJ guards about his symptoms, but they failed to assist him or deliver him to medical assistance. Mr. Smith then fainted and fell down. A guard found Mr. Smith lying by his door. Mr. Smith was left in his cell without any medical assistance.

37.     The day before he was released from the jail, Mr. Smith heard another inmate

talking about a guard who had grabbed an inmate "who was just minding his own business and slammed him on his head." The inmate identified an officer he believes was Mr. Graebner to Mr. Smith as the officer who had injured him.

38.     The only subsequent communication Mr. Smith had with Defendant Graebner was when Defendant Graebner told Mr. Smith after the attack, "You're going to be the most remembered inmate in the history of the St. Charles Jail."

39.     Prior to the January 18, 2017 incident, Mr. Smith had never had any conflict with Defendant Graebner or anyone else at the SCCJ.

40.     During his short stay at SCCJ, Mr. Smith faced harassment and disrespect by SCCJ officials throughout his time in detention, and saw SCCJ officials exhibit contempt to other inmates. For example, SCCJ officials would enter people's cells and throw around people's belongings. Mr. Smith noticed that some people were searched more often, or more aggressively, than others. For example, Black inmates were strip-searched more frequently than white inmates.

41.     Immediately after Mr. Smith was released from SCCJ on January 24, 2017, Mr. Smith went to the records division at the jail and filled out another incident report. He submitted this to the SCCJ employee managing the desk. He asked to speak to a supervisor to ensure that his complaints were being received, and that a copy of the video of the pod where the attack happened would be retained.

42.     At this time, Mr. Smith spoke with Supervising Officer Patricia Reed. Mr. Smith asked for a copy of the security video from the day of his injury, and this request was refused. However, Ms. Reed signed a letter stating that SCCJ would maintain the video of the injury pursuant to his complaint and would refrain from destroying the video. It is unclear if SCCJ retained the video, as they failed to respond to Mr. Smith's subsequent sunshine requests.

43.     Continuing to be in incredible pain and believing that he had been seriously injured and required further testing, Mr. Smith went to see his primary care doctor, Dr. Reynell, upon leaving SCCJ. As Dr. Reynell's office was closed, he went back to the emergency room at St. Joseph's to be examined. Mr. Smith was referred to neurologist Dr. Jawed Siddiqui at SSM Medical Health Group who ordered an MRI to examine Mr. Smith's injuries.

44.     Mr. Smith's medical records from SSM on January 25, 2017, describe his continuing health issues, including cold sweats, weight loss, nausea, dizziness, intermittent double vision, intermittent vomiting, intermittent coughing, and intermittent shortness of breath.

45.     Mr. Smith was unable to be scheduled for an MRI until March 2017. His exam was not treated in an emergency manner because nothing from the SCCJ's medical file indicated that emergency medical examination may be required. From January until March, Mr. Smith experienced constant and significant pain. He sometimes fell suddenly. For one entire week, he was nauseated and repeatedly vomited. For another two weeks, Mr. Smith had to sleep constantly.

46.     Mr. Smith underwent an MRI in March of 2017. The procedure revealed significant blood collecting between his brain and his skull, putting increasing and potentially fatal pressure on the brain. As soon as his doctor read the results of his MRI, Mr. Smith was admitted to St. Joseph's Hospital to prepare for surgery. Dr. Martin described to him how his injury had been getting worse over time due to a slow bleed in the lining of his brain. His doctor stated that he would likely die within two weeks if he did not immediately have surgery to remove the blood. Mr. Smith's medical records specifically document "chronic subdural hematoma" as a result of the prior head injury. The doctor also explained to Mr. Smith that had his head hit the stool a half an inch higher, he would have died on impact. The surgery was

scheduled the next day, and the doctor warned Mr. Smith's mother that only 40% of patients survive the medical procedure.

47.     Mr. Smith was admitted to the emergency room for surgery on March 25, 2017. Dr. Stanley Martin, a neurosurgeon, performed the surgery. The surgery involved drilling two dime-sized holes into Mr. Smith's skull in order to drain out blood from the injury. Mr. Smith stayed in the hospital for three days to recover from the surgery. He was discharged on March 28, 2017. The surgery saved his life.

48.     When Mr. Smith was released from the hospital, Mr. Smith's neurologist prescribed a recovery plan. Mr. Smith was specifically instructed not to drive and not to work. He was also told not to exercise, run, or lift over ten pounds and to avoid any activity that would lead to overheating in his head.

49.     Today, Mr. Smith continues to suffer from the effects of the injuries he received while incarcerated at SCCJ. His memory has worsened and he experiences frequent headaches. Mr. Smith has to visit a specialist for the pain he experiences on a daily basis. When it is humid outside, he experiences pain above his eye. He sometimes feels extreme burning in his skull where the surgery occurred. He also fatigues quickly, has developed a short temper, and has major depressive moments.

50.     Mr. Smith was jailed in St. Charles County Jail for a minor traffic violation. Due to the unjustified excessive force used by a corrections officer and the subsequent deprivation of medical care, Mr. Smith almost died while in St. Charles County's custody. For a period of time he did not know if he would survive the injury, surgery and treatment. Even today, Mr. Smiths knows that if he ever gets a head injury, he could bleed to death.

51.     Reflecting on his time at SCCJ, Mr. Smith believes that his experience

represented a broader culture of indifference towards the safety and lives of inmates at SCCJ, facilitating behavior that almost led to the loss of his life.

### Alleadhin Qandah's Attack Facilitated by SCCJ Officials and
### Continued Targeting Resulting in Pretrial Punishment and Harm

52.     Plaintiff Mr. Alleadhin Qandah is a 29 year-old Arab-American and Muslim man. He is a citizen of the United States and a resident of St. Louis County. Mr. Qandah helps care for his fiancée's two teenage children and previously worked at an auto shop in St. Charles. In March 2014, Mr. Qandah was arrested and detained at SCCJ. Mr. Qandah was held as a pretrial inmate for over eleven months until, after his assault, he eventually pled guilty to a reduced misdemeanor charge. Additionally, while incarcerated pretrial, Mr. Qandah was punitively detained in especially restrictive solitary confinement without due process. Mr. Qandah's life was put at risk when an SCCJ Officer allowed another inmate to enter his cell to attack him.

53.     Mr. Qandah was arrested on March 24, 2014. Mr. Qandah could not afford to bail himself out, and so he remained in the SCCJ awaiting trial for over eleven months.

54.     While incarcerated, Mr. Qandah's charges were repeatedly dismissed and re-filed.

55.     Mr. Qandah experienced racial and religious harassment from the start of his detention. Mr. Qandah felt targeted by a majority of the corrections officers because of his ethnicity and religion. He was called a "terrorist" and "camel jockey" and referred to as "ISIS," in reference to his Muslim faith. An SCCJ official, Defendant "John Doe II" stated: "if you don't like the laws here, go back to where you came from."

56.     Perhaps because of his religion, SCCJ corrections officers (including Officer Ridgeway) told inmates that Mr. Qandah was a "snitch." Officer Ridgeway made these comments publicly, even broadcasting them over the jail intercom. Identifying a jail inmate as a snitch subjects the inmate to a significant risk of violence at the hands of other inmates. Mr.

Qandah was threatened by several inmates, including an inmate by the name of Kionte Ballinger.

57.     Nearly immediately upon his detention, SCCJ officers ordered Mr. Qandah confined in solitary confinement. He would remain in solitary confinement for at least eight months while detained by St. Charles County. Mr. Qandah describes this treatment as feeling like he was dying, while still breathing. Mr. Qandah was never given a hearing prior to his detention in solitary confinement. His confinement in solitary felt like a punishment and part of the same targeting he was suffering while detained at SCCJ.

58.     This targeting culminated in an attack by another inmate caused by SCCJ officials' actions. On December 15, 2014 around 5:00 p.m., Mr. Qandah was asleep in his cell.

59.     Suddenly, Mr. Qandah's locked solitary confinement cell door was electronically unlocked and another inmate, Kionte Ballinger, entered the cell to attack him.

60.     The door closed behind Ballinger, locking the two detainees in the cell together.

61.     Mr. Qandah's solitary confinement cell door could only be opened and unlocked by SCCJ guards and officials.

62.     Mr. Ballinger describes going to speak with Officer Cast and asking him to unlock Mr. Qandah's cell door. Kionte Ballinger had previously threatened him from his solitary cell, stating "I bet I get at you before you get out of here." Ballinger requested access into Mr. Qandah's cell in order to attack him. SCCJ Officer Cast caused the attack by opening the door to give Ballinger access to Mr. Qandah's cell to attack him.

63.     In the solitary cell, Ballinger violently assaulted Mr. Qandah, throwing him to the floor and causing Mr. Qandah's head to strike the cell's metal toilet. Mr. Qandah got up and grabbed Ballinger and kept him in a bear hug so that the attack would stop.

64.     Around two minutes after the individual had entered Mr. Qandah's cell to attack

Mr. Qandah, Officers Cast, Reynolds, Perkins, and Worley entered the cell armed with pepper spray. By this point, the two detainees were no longer fighting. Ballinger was removed from Mr. Qandah's cell. As Ballinger was removed from Mr. Qandah's cell, he turned around and yelled, "snitch."

65.     After the incident occurred, the St. Charles Sheriff's Department ordered an investigation (Complaint #14-5921) to determine whether charges should be brought against the detainees. When both detainees stated that they did not want to press charges, the investigation was classified as "exceptional cleared." In the process of the investigation, Mr. Qandah and Mr. Ballinger, as well as a number of corrections officers, were questioned. The investigation and declarations shed further light into what occurred and SCCJ officials' involvement in the attack.

66.     In Ballinger's declaration to the St. Charles County Sheriff's Department, he states that he "went to the bubble and asked C.O. Cast if he could go talk to Quanda [*sic*] because I know from other C.O.s that he has a history of running his mouth … C.O. Cast actually opened it [Qandah's cell] … so I walked into Qandah's cell and tackled him and he fell and I heard him hit his head on his toilet." Mr. Ballinger also stated to the Detective from the Sheriff's Department that "he approached the bubble, and asked Cast to 'pop his cell' so he could 'holla at dude.'".

67.     Additionally, Ballinger describes how he was surprised by the ease with which he was let into Mr. Qandah's locked solitary cell. He states, "When I asked him [C.O. Cast] that [if he could go talk to Qandah] he hesitated, grinned, and then gave me the ok … C.O. Cast actually opened it. I was a bit uneasy 'cause I thought he wouldn't do it or that he might make a big deal out of it but that was not the case."

68.     The investigation also noted that once a cell door at SCCJ is unlocked, it could be

opened manually to completely allow a person to enter or exit. In addition, doors lock automatically once they are closed so that the door could not have been left ajar or closed without being locked.

69. The SCCJ's own investigation found that the cell door had not been operating correctly.

70. Mr. Qandah was taken to visit the SCCJ nurse after the physical assault. The St. Charles Detention Facility Inmate Health Progress Notes state that Mr. Qandah was brought to medical and stated that his head had hit the toilet. Medical record notes state that he had an abrasion on his forehead and scratches. An appointment was made with the doctor in the facility.

71. However, Mr. Qandah described a number of injuries: his jaw was injured, he suffered a concussion, and he received a black eye.

72. Mr. Qandah requested that pictures be taken of his injuries, but SCCJ officials initially refused. SCCJ officials did not take pictures until two days after the attack occurred.

73. Mr. Qandah also visited the nurse on December 17, 2014, due to lower back pain and strain.

74. After the attack, Ballinger was moved to another part of the jail but was not placed in solitary confinement. Mr. Qandah remained in solitary confinement.

75. St. Charles County never gave Mr. Qandah a hearing sentencing him to solitary confinement, but instead, following a period of protracted harassment, he was given 10-12 days in solitary.

76. However, after those 12 days, he remained in solitary confinement for more than eight months. Mr. Qandah was never told formally why he was detained in solitary confinement, nor was he allowed to appeal the decision. Guards told Mr. Qandah he was in solitary "pending

an investigation."

77. In addition, Mr. Qandah was held in especially restrictive solitary confinement.

78. While confined in solitary confinement after the incident, Mr. Qandah was alone for 23 hours per day. The decision to let him in and out of his solitary confinement cell every day was made by the SCCJ guards in that wing. During the entire period he was in solitary confinement, he was barred from accessing the law library, from obtaining a Qur'an and other religious materials, and was constantly shackled.

79. This treatment was different from treatment others in solitary received, as they often were let out four hours a day and could interact with other inmates during those hours.

80. For the first 120 days of Mr. Qandah's detention in solitary confinement, he was deprived of all communications: he could not place phone calls and he was not allowed to obtain stamps to write letters from the jail. During this four-month period, he was not able to speak with his family, even to inform them that he had been transferred to solitary confinement where his communication would be restricted.

81. Mr. Qandah explained the psychological consequences of his long periods in solitary confinement to SCCJ's psychologist, Donna (last name unknown). He specifically explained that he felt like he could not breathe while detained in solitary. Ms. Donna told Mr. Smith that she went to SCCJ supervisors including Defendant McKee to try to address the situation, and stated to Mr. Qandah that she had never seen an inmate held in solitary as long as he was held. She stated she was worried he would harm himself due to his lengthened time in solitary. One time, Mr. Qandah had to be taken to the SCCJ medical because he almost passed out in his cell. Defendant Officer McKee came by Mr. Qandah's cell one day and told him "you're not getting out."

82.     In addition to the above, while detained by St. Charles County, Mr. Qandah suffered physical harassment by SCCJ officials. Mr. Qandah was maced without justification on three different occasions. One time, Mr. Qandah was maced for refusing to switch cells after guards repeatedly harassed him by making him switch cells five times in a short period of time. For five hours after being maced and without an opportunity to wash off the mace, Mr. Qandah was bound in a restraint chair. He was then placed on suicide watch for three days.

83.     Eventually, for the sole purpose of terminating his unbearable confinement and treatment by SCCJ, Mr. Qandah accepted a plea offer with a non-incarceration sentence of probation and was released from SCCJ.

84.     Mr. Qandah was physically and psychologically harmed by his incarceration at SCCJ, especially by the attack, his continued solitary confinement, and the SCCJ employees' and officials' deliberate indifference to his public safety while incarcerated at SCCJ. These injuries continue to affect his life to this day.

85.     His time at SCCJ took a lot from his life; Mr. Qandah lost his home and his girlfriend due to his long period in solitary where he was unable to communicate externally.

86.     Due to the physical attack, Mr. Qandah's jaw cracks loudly when he eats. This causes him constant pain while he eats.

87.     The attack also disrupted Mr. Qandah's vision; Mr. Qandah's vision will become blurry if he focuses on a screen or a book and focusing can bring on a headache. Mr. Qandah has headaches for hours at a time. His headaches can be triggered by loud noises so he struggles to be with his partner's young children or in any spaces with many people. When he gets headaches, they can often continue for many hours and even keep him from sleeping.

88.     Mr. Qandah's partner of two years describes how he came back from jail with a

very different personality and was obviously psychologically traumatized. He became extremely paranoid and constantly looked over his shoulder to see if someone was following him. Since his release, he becomes agitated, upset, and anxious whenever someone walks behind him. Due to this paranoia and anxiety, he cannot be in crowded spaces.

89.     This severely impacts the work he can obtain. Mr. Qandah is even anxious in his own home. He will lock every door after him. He is constantly separated from his family because of this habit. Mr. Qandah also suffers from night terrors. He will awake from these night terrors and be unable to go back to sleep. Sometimes during the night terrors, he becomes violent. He has hit his partner while asleep.

90.     Since his detention, Mr. Qandah also suffers from mood swings and intermittent depression. He sometimes has to isolate himself for days at a time.

91.     Mr. Qandah also now struggles to concentrate and cannot do multiple tasks at a time. He struggles to remember ordinary day-to-day matters. His difficulty focusing and concentrating has made it very difficult to hold a stable job. He has learned that he has to find work where he can work by himself as he gets anxious working around other people and has anger issues when others are in his space.

92.     In January 2018, Mr. Qandah again lost his job due to his inability to work amongst other people because of his emotional trauma arising from his incarceration at SCCJ.

93.     Being detained in solitary caused deep psychological harm to Mr. Qandah. Mr. Qandah describes feeling insane being locked up alone for so many hours a day. He could not sleep properly, felt uneasy, he and felt as though he was continuously being watched. The psychological harm from this punishment continues to this day.

94.     Mr. Qandah did not have these physiological or psychological issues before St.

Charles County incarcerated and abused him.

95.     Mr. Qandah reported his harassment by corrections officers, especially Officers Ridgeway and Cast, through multiple complaints directed to Defendant Lieutenant McKee. In his complaints, Mr. Qandah outlined how the SCCJ employees and officials had threatened and attacked his physical safety. No one from SCCJ ever followed up on a complaint, nor were any officers disciplined for their actions.

96.     Mr. Qandah faced cruel and unusual punishment while detained pretrial at SCCJ. Mr. Qandah feared dying or going crazy while incarcerated at St. Charles. Mr. Qandah's treatment was made possible because of a culture at SCCJ that St. Charles Corrections allowed officers to act without control and without consequences for their actions. Mr. Qandah's time in SCCJ completely and negatively changed his life and it continues to affect him every day.

### History of Unconstitutional Conduct at SCCJ

97.     SCCJ has, for at least the past decade, maintained a culture characterized by a lack of training, supervision, and discipline that has led to the repeated victimization of inmates. The repeated nature of past abuse—as reported by individuals incarcerated at SCCJ and as held by courts—results in clear unconstitutional customs and is likely illustrative of unconstitutional policies.

98.     In 2013, after five days of pleading to SCCJ employees for medical help, inmate Robert Breeding died in St. Charles County custody. Mr. Breeding stated that he was given no medical assistance despite numerous requests for help to SCCJ corrections officers and medical staff. His civil rights case settled. *See Breeding v. St. Charles*, Docket No. 4:15-cv-00539-RWS (E.D. Mo. Aug. 3, 2017).

99.     In July 2013, Mr. Matthew Burnett, a state inmate, was housed in a unit for

federal inmates at SCCJ. While returning to his cell one day for lockdown, Mr. Burnett described

how a number of the federal inmates refused to lockdown. When he refused to join the inmates'

lockdown rebellion, he was surrounded by four federal inmates and attacked. Mr. Burnett made

eye contact before the attack with a C.O. who was in the bubble. The C.O. smiled but continued

to watch as the attack occurred. Mr. Burnett was struck in the face and the back. As he fell to the

floor, he continued to be violently attacked and eventually fell out of consciousness. SCCJ

officials failed to intervene. Mr. Burnett describes how he was seriously injured and continued to

bleed from his face for over 24 hours, but SCCJ officials failed to transfer him to the hospital.

Continued denial of proper medical care led to permanent damage to his eyesight. Mr. Burnett

was placed in solitary confinement for ten days and cited for rule violations. Mr. Burnett stated

in a civil rights complaint against SCCJ that this punishment aimed to cover the SCCJ officials'

failure to act to prevent harm. *See Burnett v. St. Charles County Jail/D.O.C. et al.*, Docket No.

4:13-cv-01990 (E.D. Mo. Oct. 2014).

100.    In 2015, Leo Roland was being held 14 months pretrial in the custody of St.

Charles County when he was robbed by other inmates after he stated that SCCJ officials shared

his grievance form with other inmates. Mr. Roland was labeled a "snitch," robbed of his

belongings, and threatened with violence. *See Roland v. Cnty. Of St. Charles,* 4:15-cv-00966

(E.D. Mo. Sept. 21, 2015).

101.    During a period of incarceration in 2013-14, a female inmate experiencing mental

health difficulties states how she was repeatedly refused treatment by SCCJ staff. After

complaining to the staff about inadequate care, she was sprayed with pepper spray and physically

assaulted by various corrections officers. After being labeled a "problem inmate" by SCCJ staff,

she was also denied food, physically assaulted, and left in isolation for extended periods of time.

Once, corrections officers handcuffed her to a table, where she was subjected to assaults from other officers as well as fellow inmates. *See Williams v. Crawford*, No. 4:17-CV-1475-AGF, 2017 WL 3392119, at *3 (E.D. Mo. Aug. 7, 2017).

102.     In 2014, an inmate at SCCJ named Mr. Richard Goodson was assaulted by his co-defendant who had been intentionally separated into a different pod, when an SCCJ official opened a locked cell door so that the co-defendant and others from the other pod could enter to assault him. After the initial assault, Mr. Goodson describes how SCCJ officials failed to intervene and allowed the fight to continue for a few minutes as others joined in the beating, causing Mr. Goodson physical injuries. When Mr. Goodson requested to speak with a supervisor about the beating, he was threatened with time in solitary confinement. After repeated requests for medical assistance regarding his assault, he was finally able to meet with a nurse at the jail. The inmate completed several "Inmate Concern Forms," and received no response from administration at the jail about his complaints. *See Goodson v. Cty. of St. Charles Dep't of Corr.*, No. 4:14-CV-1845-NCC, 2015 WL 58947, at *2 (E.D. Mo. Jan. 5, 2015).

103.     In 2017, Mr. Shaun Wilga was severely beaten by another SCCJ inmate known to be dangerous who was negligently let out of a cell. Mr. Wilga describes how he was knocked unconscious and later needed several stitches and staples. His numerous complaints regarding his assault were ignored. *See Wilga v. Crawford*, No. 4:17-CV-1457 CDP, 2017 WL 3034715, at *1 (E.D. Mo. July 18, 2017).

104.     In September 2017, an SCCJ inmate described unsafe conditions at SCCJ due to short-staffing, resulting in many fights without officials' interventions. The inmate described how fights would go unnoticed, resulting in bad beatings. The inmate also described how even in monitored situations, SCCJ officials often failed to intervene or de-escalate disputes between

inmates resulting in serious harm to inmates. Williams v. Crawford, No. 4:17-CV-1475-AGF, 2017 WL 3392119, at *3 (E.D. Mo. Aug. 7, 2017).

105.    In September 2017, the same inmate described unsafe conditions due to unsanitary jail conditions. He described seeing roaches of three to four inches in length in the hallways and mice inside the jail. He also described seeing black mold in the building. Williams v. Crawford, No. 4:17-CV-1475-AGF, 2017 WL 3392119, at *3 (E.D. Mo. Aug. 7, 2017).

106.    Plaintiff Qandah described harassment and deeply unprofessional behavior by SCCJ officials. Mr. Qandah described how officers would search cells as they pleased, often throwing people's belongings around. SCCJ officials also unnecessarily buzzed the intercom and turned lights on to wake individuals up in the middle of the night.

107.    An inmate described how SCCJ officials often acted in racially discriminatory ways, instigating racial tension between inmates.

108.    In 2014, a female corrections officer at SCCJ claimed that the administration and supervisors of the jail ignored her repeated claims of sexual harassment by fellow employees and supervisors. She alleged that she was not only subjected to a host of offensive comments by fellow male employees, but that SCCJ supervisors participated in such comments as well. After she made formal complaints to supervisors, she was physically intimidated and threatened by other SCCJ employees. A supervisor later told her, "That's nothing new, that kind of stuff goes on every day." See Schnur v. St. Charles, St. Charles County Circuit Court Case No. 1411-CC00293 (Mar. 29, 2014). This lawsuit settled in 2016.[1]

109.    In 2015, a former SCCJ guard who became employed by St. Charles Criminal Court acknowledged to Plaintiff Qandah that the county jail has many complaints filed against it

_____

[1] Mark Schlinkmann, *Ex-St. Charles County Jailer Gets $141,894 in Settlement of Harassment Suit*, St. Louis Post Dispatch (Oct. 3, 2016), http://www.stltoday.com/news/local/stcharles/ex-st-

related to unsafe conditions in the jail.

110.    In *pro se* civil rights complaints filed by individuals incarcerated since 2012, individuals repeatedly describe the jail's failure to investigate and act upon complaints made through the SCCJ's internal complaint process. Individuals repeatedly describe the over and unjustified use of solitary confinement. Doctors have conclusively reported on the long-term destructive effects of solitary confinement.

111.    Past instances of harm to inmates demonstrate a clear culture, custom, and/or policy by St. Charles County of overt mistreatment of and deliberate indifference to the rights of pretrial detainees and prisoners incarcerated in St. Charles County Jail.

112.    These abuses additionally have a racial component to them as incarceration rates in SCCJ mirror broader regional patterns of over-incarceration of non-White communities. African American inmates make up 20% of the jail, and Latino inmates make up 25% of the jail, despite the fact that 90% of St. Charles county residents are White.[2]

113.    These abuses additionally impact the poor as inmate reports indicate that many individuals are held at St. Charles pre-trial based only on their inability to pay their bail.

## CLAIMS FOR RELIEF

### COUNT I
**Eighth Amendment Excessive Force and Cruel and Unusual Punishment Claim Cognizable under 42 U.S.C. § 1983 by Plaintiff Smith Against Defendant Graebner**

114.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

115.    Under the Eighth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, Plaintiff Eric Smith, as a convicted prisoner, had the

_____

[2] The Vera Institute, *Incarceration Trends: St. Louis County* (Jan. 20, 2018), *available at* http://trends.vera.org/profile?fips=29183&incarceration=disparity&usage=turnover&similar=arrestRate.

right to be free from cruel and unusual punishment.

116.     The violence Defendant Graebner inflicted on Plaintiff Mr. Smith constitutes excessive and unjustified deliberate use of force by a prison officer, which was unnecessary under the circumstances, all in violation of Mr. Smith's Eighth Amendment rights.

117.     Specifically, despite Mr. Smith being in a state of unthreatening compliance, Defendant Officer Graebner intentionally grabbed Mr. Smith from behind without any warning, then lifted and slammed Mr. Smith headfirst into a metal stool with force and violence causing extensive injury to Mr. Smith's head and brain.

118.     No reasonable officer in Defendant Graebner's position would perceive Mr. Smith a threat in that moment, and Defendant Graebner made no effort to temper the severity of his forceful action.

119.     In all, Defendant Graebner's actions were maliciously and sadistically done for the purpose of causing harm to Plaintiff Smith, and not in a good faith effort to maintain or restore discipline.

120.     Defendant Graebner's actions caused harm to Plaintiff Smith, who suffered significant physical injury requiring life-saving brain surgery, along with physical pain and suffering that continues to this day.

121.     Qualified immunity does not protect Defendant Graebner from this claim, as slamming an inmate's head without any justification represents plain use of excessive force, which constitutes cruel and unusual punishment in clear violation of Plaintiff Smith's constitutional rights under the Eighth and Fourteenth Amendments.

122.     If Mr. Smith prevails, he is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT II

**Fourteenth Amendment Claim for Deliberate Actions, or in the alternative, Deliberate Indifference, Resulting in Punishment to Pretrial Detainee Cognizable under 42 U.S.C. § 1983 by Plaintiff Qandah Against Defendants Cast, Ridgeway, McKee**

123.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

124.    Under the Fourteenth Amendment to the United States Constitution, Plaintiff Qandah, as a pretrial detainee, had a right to be free from pre-trial punishment, which was violated when he was incarcerated under conditions posing a substantial risk of serious harm, and this harm resulted from Defendants' deliberate indifference to the substantial risk of serious harm.

125.    SCCJ officials, and especially Defendant Cast and Defendant Ridgeway, put Mr. Qandah at risk of serious harm through their deliberately indifference to his safety while he was held as a pretrial inmate in SCCJ.

126.    By publicly labeling Plaintiff Qandah a "snitch" in front of other inmates, Defendant officers put him at risk of serious harm by other inmates at the facility. As described above, the inmate who attacked Mr. Qandah stated that he did so because he heard SCCJ officers describe Mr. Qandah as a snitch. Defendant officers were deliberately indifferent to this serious and known risk. Defendant officers conduct was malicious and recklessly indifference when they labeled him a "snitch" as it is clear that this term puts individuals at great risk of harm while incarcerated.

127.    Defendant Cast's act of unlocking Mr. Qandah's cell door so that another inmate could harm Mr. Qandah amounted to deliberate indifference to a substantial risk of serious risk to an inmate. Mr. Qandah was in fact harmed due to this action, as another inmate entered and caused him physical and psychological injury.

128.     Defendant Cast's conduct was malicious and recklessly indifferent. Officer Cast was specifically told by another inmate that he wanted the door opened in order to harm Mr. Qandah. Officer Cast then electronically unlocked the door in order for the inmate to harm Mr. Qandah.

129.     Qualified immunity does not protect officers from suit as deliberate actions including unlocking a cell door to permit an inmate to attack another, or dangerously labeling an individual as a snitch so an inmate could be injured, clearly violate Plaintiff's well-established constitutional rights.

130.     If Mr. Qandah prevails, he is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.


**COUNT III**
**Fourteenth Amendment Claim for Lack of Due Process For Detainees Sentenced to Solitary Confinement Resulting in Punishment of Pretrial Detainees Cognizable under 42 U.S.C. § 1983 by Plaintiff Qandah Against Defendant McKee**

131.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

132.     Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Plaintiff Qandah, as a pretrial detainee, is protected from the use of excessive force that amounts to punishment.

133.     Plaintiff Mr. Qandah was held in solitary confinement for the majority of his eleven months in SCCJ. Mr. Qandah suffered great and long-term emotional and physical harm due to this confinement, amounting to excessive force. Mr. Qandah was not afforded the protections of notice and hearing under the Due Process Clause before he was committed to solitary confinement.

134.    Defendant McKee's decision to hold Mr. Qandah in solitary confinement for nearly the entire eleven-month period of his pretrial detention caused Mr. Qandah significant and continuing psychological harm, including long-term and debilitating anxiety, depression, night terrors, and difficulty holding a stable job. These injuries amounted to excessive force.

135.    Defendant's conduct was malicious or recklessly indifferent as there was either no justification provided for his long-term solitary confinement, or alternatively motivated by evil intent as punishment for his race, religion, or the complaints he made while incarcerated.

136.    Qualified immunity does not protect officers from suit, as prolonged solitary detention without due process constitutes punishment for pretrial detainees in clear violation of Plaintiff Qandah's well-established constitutional rights.

137.    If Mr. Qandah prevails, he is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### COUNT IV
**Fourteenth Amendment Claim for Deprivation of Medical Care Amounting to Cruel and Unusual Punishment Cognizable under 42 U.S.C. § 1983 by
Plaintiff Qandah Against Defendant McKee**

138.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

139.    Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Plaintiff Qandah, as a pretrial detainee, is protected from the use of excessive force that amounts to punishment. Deliberate indifference to serious medical needs of a pretrial detainee amounts to excessive force.

140.    SCCJ officials denied Plaintiff Mr. Qandah access to proper medical care resulting in harm and psychological injury to Plaintiff that continues to this day.

141.    While incarcerated at SCCJ, Plaintiff Mr. Qandah suffered a serious injury when another inmate physically battered him after Defendants allowed inmate into Mr. Qandah's cell. Mr. Qandah was denied proper medical care for this injury. In addition, Mr. Qandah was denied proper medical care for injuries suffered while detained in solitary confinement for months at a time.

142.    Plaintiff repeatedly made SCCJ officials aware of his serious need for medical care through repeated requests for medical care. This necessary care was not provided by SCCJ to Mr. Smith.

143.    Failure to provide necessary medical care exacerbated the condition of Plaintiff's injuries.

144.    Defendant McKee acted maliciously and recklessly indifferent against Plaintiff Qandah when he denied Mr. Qandah access to proper medical care despite multiple requests for this necessary care.

145.    Qualified immunity does not protect officers from suit as failure to provide proper medical care constitutes punishment for pretrial detainees clearly violating plaintiff's constitutional rights.

146.    If Mr. Qandah prevails, he is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.


### COUNT V
**Eighth Amendment Failure to Provide Proper Medical Care Resulting in Cruel and Unusual Punishment of Prisoners Cognizable under 42 U.S.C. § 1983 by Plaintiff Smith Against Defendant "John Doe I"**

147.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

148.     The Eighth Amendment to the United States Constitution protects prison inmates including Mr. Smith from deliberate indifference to their serious medical needs where they suffered from a serious medical conditions known by the Defendants, including Defendant John Doe I, which Defendant John Doe I deliberately disregarded.

149.     Plaintiff Smith suffered from severe medical conditions when he was physically assaulted by Officer Graebner and his head was slammed onto a hard metal stool. These medical injuries were clearly known to SCCJ staff including Defendant John Doe I, as Mr. Smith began to profusely bleed from the head. Mr. Smith additionally shared details of his injury and his pain to the SCCJ nurse and the emergency room doctor. Mr. Smith's medical condition was disregarded by SCCJ officials, and especially Defendant John Doe I, but was additionally worsened through Defendant Doe I's interference in Mr. Smith's medical examination.

150.     Defendant Officer Doe I interfered in Mr. Smith's medical consultation resulting in lack of necessary medical care and serious medical injury. SCCJ officers further failed to administer his prescribed medications.

151.     Actions by SCCJ officers, and especially Defendant Officer Doe I exacerbated Mr. Smith's medical condition and worsened his injury over time. Defendant Doe I was aware of Mr. Smith's medical injuries as he was in the examination room with him while Mr. Smith had to receive six stitches to prevent continued bleeding.

152.     Defendant Officer John Doe I interfered in Mr. Smith's medical consultation resulting in preventing Mr. Smith from receiving necessary medical care and serious medical injury. Other SCCJ officers further failed to administer Mr. Smith's prescribed medications. Defendants were clearly knowledgeable about Mr. Smith's serious medical condition and deliberately disregarded the injury. This deprivation of medical care exacerbated Mr. Smith's

medical condition as the injury worsened over time.

153.     Officer John Doe I's actions were malicious and recklessly indifferent when he intentionally interfered in Mr. Smith's medical consultation causing him serious medical injury.

154.     Qualified immunity does not protect officers from suit as plaintiff clearly suffered a serious medical condition and Defendants knew and deliberately disregarded the condition clearly violating plaintiff's constitutional rights.

155.     If Mr. Smith prevails, he is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.


## COUNT VI
### First Amendment Claim for Limitations on Freedom to Practice Religion of Islam Cognizable under 42 U.S.C. § 1983 by Plaintiff Qandah Against Defendant "John Doe II"

156.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

157.     The First Amendment to the United States Constitution protects individuals' rights to practice the religion of their choice, provided that their belief is religious and sincere.

158.     Mr. Qandah is a devout Muslim man who practice his religion and made clear to the jail that he was a practicing Muslim.

159.     Mr. Qandah was restricted in his ability to practice his religion through the actions of SCCJ officers, including Defendant Officer John Doe II.

160.     While incarcerated, and especially while detained in solitary confinement, Mr. Qandah was restricted by Defendant Officer John Doe II from freely practicing his religion.

161. Specifically, Mr. Qandah was denied access to a Qu'ran, the Islamic religious text. Mr. Qandah's meals during Ramadhan, after an entire day of fasting, were frequently many hours late and cold. Mr. Qandah was verbally harassed for his religious beliefs.

162. Mr. Qandah suffered injury, as he was not allowed to freely practice his religion without explanation.

163. There were no justifications for Defendant John Doe II's restrictions on Mr. Qandah's ability to practice his religion.

164. Defendant Officer John Doe II's actions were malicious and recklessly indifferent as they were likely motivated by an intent to discriminate against Plaintiff Qandah due to his religious beliefs.

165. Qualified immunity does not protect officers from suit as restrictions related to core religious beliefs without necessity or provision of alternative ways to practice clearly violate plaintiff's constitutional rights.

166. If Mr. Qandah prevails, he is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.


**COUNT VII**
**Fourteenth Amendment Equal Protection Claim cognizable under 42 U.S.C. § 1983 by Plaintiff Qandah Against Defendants St. Charles County and Crawford**

167. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

168. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no one should be denied the equal protection of the laws.

169.     Plaintiff Qandah, one of very few Muslims in SCCJ, was held in solitary confinement for the majority of his time in jail and was repeatedly and continuously harassed based on his race or religion while at St. Charles County jail.

170.     Plaintiff was also subject to abusive language by Defendants aimed at his ethnic and religious background. Among the slurs used against him by Defendant employees were "camel jockey", "ISIS", and  "terrorist".  Defendant Cast told Mr. Qandah, "Muslim culture is fake." Mr. Qandah who is a U.S. citizen, was also told that if he did not like certain prison conditions, he should go back to the country he was from.

171.     The extended period of solitary confinement served no penological purpose and was intended to punish him because of his religious and national background. Mr. Qandah's general abuse by officers and his commitment to solitary confinement amounted to a denial of equal protection.

172.     Defendant Larry Crawford, as Director of the St. Charles County Department of Corrections and final policymaker for the SCCJ, promulgated policies and customs that failed to train, discipline, or supervise SCCJ employees with deliberate indifference to the rights of Mr. Qandah and other inmates to be free from religious discrimination.

173.     The policies and customs promulgated by Defendant Crawford and St. Charles County were the moving force behind Mr. Qandah suffering religious discrimination by the SCCJ employees as set forth above and in violation of Mr. Qandah's First and Fourteenth Amendment rights.

174.     The cumulative abusive and targeted nature of Mr. Qandah's treatment also rises to a standard of malicious and reckless indifference.

175.    Qualified immunity does not protect officers from suit as officials' actions clearly resulted in Qandah's differential treatment because of his religious background clearly violate plaintiff's constitutional rights.

176.    If Mr. Qandah prevails, he is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.


**COUNT VIII**
**Municipal Liability *Monell* Claim by All Plaintiffs**
**Against Defendant St. Charles County and Defendant Crawford for Failure to Supervise, Train, Investigate Complaints, and Discipline**

177.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

178.    It is and has been Defendant St. Charles County's policy, practice, and custom to inadequately train and supervise its SCCJ officers in order to maintain safe conditions for people incarcerated in their jail.

179.    Defendant St. Charles County likewise, as a policy and practice, has failed to instruct, train, or supervise its corrections officers with respect to preventing and responding to clear instances of unconstitutional employee behavior, as well as clear instances putting detainees in harmful positions. It is therefore culpable for the constitutional violations set forth in Counts I through VII, above, pursuant to *Monell v. N.Y. Dep't of Soc. Svcs,* 436 U.S. 658 (1978).

180.    In addition, Defendant County has ratified the unsafe treatment of St. Charles detainees by failing to respond to allegations of medical deprivation or harm to detainees and inmates. This failure to train and supervise was a cause of Plaintiffs' injuries.

181.    It is and has been the policy, practice, and custom of Defendant SCCJ to inadequately investigate complaints brought by detainees and to inadequately or completely fail

to discipline SCCJ officers who commit violations of detainees' rights. To the contrary, the County has instead ratified the unsafe treatment of SCCJ detainees through their customary or policy-mandated conduct putting individuals incarcerated at SCCJ in harmful situation. Defendants' failure to investigate complaints and failure to hold officials' accountable for misconduct is a cause of plaintiffs' injury as a culture of non-accountability promoted harmful conduct at SCCJ.

182.    Each of these failures as described above constitute the official policies and customs of Defendant St. Charles County, which are all deliberately indifferent to the violation of rights of SCCJ detainees.

183.    Each of the above-described policies and customs of Defendant St. Charles County were the moving force behind the constitutional violations performed against Plaintiff Smith and Plaintiff Qandah in Counts I through VII, above, and were the direct and proximate cause of the violations of Plaintiffs' rights as alleged herein, as well as damages.

184.    If Plaintiffs prevail, they are entitled to an award of their attorneys' fees under 42 U.S.C. § 1988.


## COUNT IX
### Missouri Common Law Assault Claim
### Against Defendant Graebner by Plaintiff Smith

185.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

186.    Defendant Graebner intentionally used his hands and body without justification against Plaintiff Eric Smith when he grabbed Mr. Smith from behind, lifted him, and slammed his head into a hard metal stool.

187.     Defendant Graebner's actions caused serious injury to Mr. Smith's head and brain, and placed Mr. Smith in a reasonable apprehension of harm.

188.     As a direct and proximate result of the unlawful conduct of Defendant Graebner described above, Plaintiff Smith was made to suffer severe pain and psychological anguish.

189.     Additionally, the actions of Defendant Graebner caused or contributed to cause Plaintiff to incur ongoing medical expenses.

190.     Defendant Graebner's actions were willful, wanton, and done with malice such that punitive damages pursuant to R.S.Mo. § 510.265 should be awarded in favor of Plaintiff Smith and against Defendant Graebner in an amount of $500,000 or five times the net amount of the judgment awarded to Plaintiff Smith against Defendant Graebner, to punish Defendant Graebner's deplorable conduct and to deter Defendant Graebner and others from engaging in such behavior in the future.


**COUNT X**
**Missouri Common Law Battery Claim**
**Against Defendant Graebner by Plaintiff Smith**

191.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

192.     Defendant Graebner intentionally acted to cause injury and harm to Plaintiff Eric Smith when he grabbed Mr. Smith from behind, lifted him, and slammed his head into a hard metal stool.

193.     Defendant Graebner's actions caused immediate and ongoing injury to Mr. Smith's head and brain.

194.     As a direct and proximate result of the unlawful conduct of Defendant Graebner

described above, Plaintiff Smith was made to suffer severe pain and psychological anguish, which continue to this day.

195.    Additionally, the actions of Defendant Graebner caused or contributed to cause Plaintiff to incur actual damages in the form of ongoing medical expenses.

196.    Defendant Graebner's actions were willful, wanton, and done with malice such that punitive damages pursuant to R.S.Mo. § 510.265 should be awarded in favor of Plaintiff Smith and against Defendant Graebner in an amount of $500,000 or five times the net amount of the judgment awarded to Plaintiff Smith against Defendant Graebner, to punish Defendant Graebner's deplorable conduct and to deter Defendant Graebner and others from engaging in such behavior in the future.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a.  Enter judgment in favor of each Plaintiff against each of the Defendants in their respective individual or official capacities as set forth above;

b.  Enter judgment in Count VIII in favor of each Plaintiff against Defendant St. Charles County for its *Monell* liability for the actions of the individual Defendants described in Counts I through VII;

c.  Award each Plaintiff monetary damages, including their actual damages and compensatory damages, as the Court deems appropriate, pursuant to 42 U.S.C. § 12133 and 29 U.S.C. §794a;

d.  Award each Plaintiff punitive damages for Counts I through VII and Counts IX through X against the individually named defendants in their individual capacities, to be determined by a jury;

e.  Award Plaintiffs all litigation costs, expenses, and attorneys' fees recoverable under federal law, pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a in Counts I through VIII; and

f.  Allow such other and further relief as this Court deems just and proper.

Dated: Jan. 31, 2018                    Respectfully submitted,

**Arch City Defenders, Inc.**

By: /s/ *Sima Atri*
    Blake A. Strode (MBE #68422MO)
    Michael-John Voss (MBE #61742MO)
    Sima Atri (MBE #70489MO)
    Nathaniel R. Carroll (MBE #67988MO)
    John M. Waldron (MBE #70401MO)
    1210 Locust Street, 2nd Floor
    Saint Louis, MO 63103
    (855) 724-2489
    (314) 925-1307 (fax)
    bstrode@archcitydefenders.org
    mjvoss@archcitydefenders.org
    satri@archcitydefenders.org
    ncarroll@archcitydefenders.org
    jwaldron@archcitydefenders.org

    and

**Khazaeli Wyrsch, LLC**

    James R. Wyrsch, #53197
    Javad M. Khaezaeli, #53735
    911 Washington Ave #211
    Saint Louis, MO 63101
    314-288-0777
    314-400-7701 (fax)
    james.wyrsch@kwlawstl.com
    javad.khazaeli@kwlawstl.com

    *Attorneys for Plaintiffs*